## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Brion Finlay and all others similarly situated,
*Plaintiffs*

vs.

MyLife.com Inc.,
*Defendant*

Case No: 0:20-cv-1105

# AMMENDED CLASS ACTION COMPLAINT

Plaintiff, by and through his attorneys, for his Complaint against Defendant and on behalf of all others similarly situated, upon personal knowledge as to his own facts and conduct and on information and belief as to all other matters, states and alleges as follows:

### Nature of the Case and Defendant's Unlawful Business Practices

1. Mr. Finlay's experience with Defendant is typical of those of the putative class he seeks to represent. Mr. Finlay is currently interviewing for new jobs. Like all individuals in similar circumstances, Mr. Finlay's success in finding employment is highly reliant on maintaining a good name and reputation. Because Mr. Finlay is exploring new employment options, it is common for potential employers to perform a quick internet search using terms similar to "Brion Finlay".

2. Searching "Brion Finlay" or similar terms using Google (accessed through an anonymous browser window) produces the following result: "Brion Finlay (C), 42- Minneapolis, MN Has Court or Arrest Records …"

3. The search result displays in a browser window as follows:



4. Upon clicking on the link, users are brought to a page simultaneously created by Defendant that states, "**Brion DOES have Arrest or Criminal Records**" (emphasis original).

5. The page displays as follows:



6. Defendant alleges to calculate Mr. Finlay's "reputation" score as 2.32- 3.51 based on its assessment of public records and reviews by individuals.

7. According to the company, a reputation score of 2.32 would equate to a "poor" general reputation.

8.  Upon attempting to view Mr. Finlay's records controlled by the Defendant, and after the company states that Mr. Finlay is a sex offender (which he is not), MyLife.com states that Mr. Finlay's profile may contain "graphic content and sensitive details".

9.  For a fee, page viewers are then offered additional information about Mr. Finlay and any other individual unfortunate enough to have a report.

10. MyLife.com claims to be in the business of tracking data on "reputations" and selling the information to third parties for the purpose of "keeping yourself safe" from, *inter alia*, "home service providers".

11. The Defendant alleges on its site that the reputation score it calculates is more "important than a credit score" and that a poor reputation as indicated by the score calculated by the company could is useful in, *inter alia*, filtering job applicants, service providers, business opportunities, and dating prospects.

12. To draw in unwitting individuals, MyLife.com widely advertises that a poor reputation score could cost someone a job and affect personal relationships; for example, in one advertisement the company states, "Did you ever send out your resume and never hear back?" and "A bad reputation can hurt you personally and professionally."

13. In addition to marketing its reports to third parties, MyLife.com also runs a classic cyber extortion scheme whereby the company offers to allow users to remove the false and otherwise negative information the company posts in exchange for a fee paid directly to the company.

14. The company runs this scheme under the guise of "reputation repair" by asking that individuals "claim" their page with information allegedly collected by third party sources; in fact, the company itself is the true publisher of the information in many cases, having improperly interpreted third party records, falsely attributed records to the wrong users, added additional totally fabricated information, and in nearly all cases, heavily editorialized otherwise accurate information.

15. The company then asks users to enroll in a monthly plan costing between $13.95 and $16.95 per month (minimum commitments required).

16. The United States Department of Justice has, since the original filing of this matter, filed suit against Defendant alleging, *inter alia*, that the company thereafter prevents subscribers from canceling Defendant's fraudulent services violating a host of federal laws.

17. Once the user pays MyLife.com, the company then attempts to up-sell users by asking them to purchase additional levels of viewing and "control" for the pages the company produces.

18. In so doing, MyLife.com also markets reputation and consumer report repair services directly to the same individuals about whom the company creates and posts negative and defamatory information.

19. MyLife.com posts a portion of the information it collects about individuals to individual teaser pages ("Teaser Pages") linked to the individual's name to optimize exposure during individual name queries using search engines: Such behavior assures

MyLife's data will display in search results when an individual searches for a victim's name.

20. After an individual clicks on any one of Defendant's pages, a victim's name and other personal information is displayed together with an "estimated score"; Defendant thereafter queries a variety of public record databases and other less reliable sources together with alleged "user reviews" to obtain information on the individual about whom the search is being conducted and to calculate the individual's final reputation score.

21. Defendant then displays the information on a "report page" posted and displayed after the search concludes.

22. Neither the report page nor the teaser pages generated by Defendant contain the aggregated information in the same form in which it was allegedly obtained from the third-party sources.

23. Instead, Defendant editorializes the information giving its own (often incorrect) and highly sensationalized interpretation of the information it obtains.

24. For example, Defendant incorrectly interprets noncriminal petty misdemeanors issued in Minnesota (including parking tickets) – commonly referred to a violations, not crimes – as "criminal records" and thereafter states that individuals, Mr. Finlay (and counsel) included, with such minor tickets have "criminal or arrest records".

25. Because petty misdemeanors are not crimes in Minnesota, this statement is false on its face.[1]

26. Plaintiff alleges that Defendant intentionally posts this false information in an effort to cause maximum reputational harm (or the perception thereof) in an effort to extort payment from individuals.

27. Various sources note that as of June 2019, the Federal Trade Commission and the Better Business Bureau ("BBB") received nearly 30,000 complaints from consumers about the MyLife.com website.

28. Of those received, 6,800 were received by the BBB in an 11-month span from 2018-2019.

29. The CEO of Better Business Bureau of Los Angeles & Silicon Valley, said consumers have complained to the BBB that the website uses scare tactics to gain paid subscribers.

30. Plaintiff alleges that in addition to these scare tactics, Defendant actively and knowingly engages in defamation with malice, *inter alia*, falsely reporting criminal records exist, in the hope of extorting payment from individual consumers.

31. On July 27, 2020 the United States Department of Justice in conjunction with the Federal Trade Commission filed suit against Defendant alleging various violations of federal law including the Fair Credit Reporting Act.

---

[1] Minnesota Statute 609.02 Subdivision 4a. which states: "'Petty misdemeanor' means a petty offense which is prohibited by statute, **which does not constitute a crime** and for which a sentence of a fine of not more than $300 may be imposed."

**Statement of Jurisdiction and Venue**

32. This Court has original subject-matter jurisdiction over this proposed class action pursuant to 15 U.S.C. § 1681 et. seq., The Fair Credit Reporting Act ("FCRA"), and 28 U.S.C. § 1332(d), the Class Action Fairness Act ("CAFA"). CAFA explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a state different from any defendant, and the amount in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Mr. Finlay is a citizen of Minnesota. On information and belief, MyLife.com, Inc. is a citizen of Delaware. On information and belief, the amount in controversy exceeds $5,000,000.00.

33. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**Applicable Statutory Law**

34. The FCRA's requirements apply to any Credit Reporting Agency ("CRA"), which Section 603(f) defines as:

> "[A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."
>
> 15 U.S.C. § 1681a(f).

35. FCRA Section 603(d) defines a "consumer report" as:

"[A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under Section 604."

15 U.S.C. § 1681a(d).

36. CRAs that sell consumer reports must comply with the FCRA. Section 604 of the FCRA, 15 U.S.C. § 1681b, prohibits a CRA from furnishing consumer reports to persons whom it does not have a reason to believe have a permissible purpose to obtain the consumer report. FCRA Section 604 lists the "permissible purposes" for obtaining the report allowed under the FCRA. 15 U.S.C. § 1681b(a)(3)(A)-(G).

37. Section 605(a) of the FCRA, 15 U.S.C. 15 U.S.C. 1681c(a) expressly prohibits a CRA from furnishing consumer reports containing information about bankruptcies, civil suits, civil judgements, tax liens, collection accounts, records of arrest and any other adverse information (other than convictions of crimes) that antedate the report by more than seven years.

38. Section 607(a) of the FCRA, 15 U.S.C. §1681e(a), requires a CRA to maintain reasonable procedures to limit the furnishing of consumer reports to the purposes permitted by FCRA Section 604, 15 U.S.C. § 1681b. The reasonable procedures mandated by Section 607(a) must:

    a. Require the prospective user of the information to identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purposes;

    b. Make a reasonable effort to verify the identity of a new prospective user and the uses for the consumer report certified by that prospective user before furnishing a consumer report; and

    c. Limit the furnishing of consumer reports to the purposes listed under Section 604.

39. FCRA Section 607(b) requires a CRA to follow reasonable procedures to assure the maximum possible accuracy of consumer report information. 15 U.S.C. § 1681e(b).

### Parties

40. Plaintiff is an adult resident of Minnesota.

41. Defendant MyLife.com, Inc. is a foreign consumer reporting agency registered in the State of Delaware.

42. Plaintiff is informed and believes, and thereon alleges, that at all times relevant Defendant conducted business in the State of Minnesota and in the County of Hennepin.

### Facts Common to All Claims Individual and Class

43. Plaintiff and all persons about whom Defendant publishes reports are individual "consumer[s]" as defined by 15 U.S.C. § 1679a(1) and § 1681a(c).

44. MyLife.com is a "consumer reporting agency" as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f) because the company regularly uses the internet to collect and assemble consumer information and thereafter attempts to sell consumer reports to third parties.

   a. *Inter alia*, the company purports to assemble information from "public information, gathered from government, social, and other sources, plus personal reviews written by others."

   b. MyLife.com actively promotes its background reports to third parties for use in employment, tenant screening, and other uses covered by the FCRA, and, in fact, Defendant's reports are used for such proposes.

   c. MyLife.com expressly states in its marketing that its reports should be used for the purpose of "keeping yourself safe" from, *inter alia*, "home service providers" thereby directly effecting their employment.

45. Mylife is also a "consumer reporting agency" as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f) because the company regularly *evaluates* other information for the purpose of furnishing consumer reports to third parties using the internet. 15 U.S.C. §1681a(f)/ §603.

   a. *Inter alia*, the company purports to review public records and other data including income and court records to determine a "reputation score" which the company then publishes on its consumer reports.

   b. The Defendant further states on its site that the reputation score it calculates is more important than a credit score and that a poor reputation as indicated

by the score MyLife.com calculates may be used by some for the assessment of job applicants and business opportunities.

46. In fact, Defendant is a for profit business, having collected millions of dollars from American consumers seeking to purchase Defendant's reports and millions more from other consumers paying to correct false and defamatory information Defendant has posted online. Although Defendant provides its Teaser Reports to market its paid reports. Both Defendant's Teaser Reports and its paid reports constitute consumer reports as defined by the Act and both are available to dues paying members.

47. Defendant's disclosures constitute "consumer reports" as defined by 15 U.S.C. § 1681a(d) because Defendant's reports, including that prepared with respect to Plaintiff, include information such as home value, annual income, court or arrest records, and bankruptcies, and purport to reflect the character, general reputation, personal characteristics, and/or mode of living of the subject.

   a. Defendant promoted Mylife.com's reports to the public for use in employment, tenant screening, and other uses covered by the FCRA and expected the background reports to be used for those purposes. 15 U.S.C. 1681a(d).

   b. In fact, various individuals regularly consult MyLife.com reports in making home service provider selections and selections about to whom to rent.

48. Defendant also actively markets its consumer reports to individuals who are seeking to hire home service providers and others.

49. Furthermore, Defendant indirectly – and in some cases directly – markets its "reputation score" to employers by touting the importance of assuring that the individuals with whom they do business have "good reputations".

50. In its advertising, the company expressly acknowledges that its reputation scores may be used by employers and that failure to have a good reputation score on its site may result in loss of employment opportunity.

51. Defendant, despite disclaiming any liability under the FCRA in the site terms, does nothing to assure its reports are not used by potential employers.

52. In fact, the company allows individuals in personal and business capacities to view reports even if they refuse to certify that they are not using the reports for employment purposes.

53. It is also true that various uninformed individuals regularly consult MyLife.com reports in making home service provider selections and other hiring decisions.

54. Defendant prepared and issued consumer reports concerning the proposed class representative, Mr. Finlay, and various proposed class members that also included false and inaccurate information.

55. Various individuals seeking to employ Mr. Finlay and other proposed class members have consulted consumer reports furnished by Defendant.

56. Other individuals with no permissible purpose have also consulted the reports of Mr. Finlay and other proposed class members.

57. The direct result of Defendant's false reports and unlawful disclosure has been significant damage to the perceived reputations of Plaintiff and other proposed class

members, thereby impacting their employment opportunities and causing such

persons exceptional personal stress.

58. Defendant's reporting has also resulted in an unwarranted intrusion into Plaintiff's

and the other proposed class member's personal affairs.

59. As a result of Defendant's conduct, various class members have suffered from

intrusion into their personal affairs, anger, frustration, anxiety and, in some cases, loss

of employment opportunity and general standing in the community.

60. Defendant, as part of its core business process, publicly displays consumer report

information, including that of Mr. Finlay, to various individuals who do not have a

permissible purpose for receiving such information.

61. Defendant presently possesses information about the number of times a specific

profile, including that of Plaintiff, has been viewed and the IP address of the viewer.

62. Defendant uses this data to send marketing emails to individuals containing the

specific number of times a profile has been viewed.

63. The IP addresses of users viewing reports can be used to identify viewers, including

in many cases, the physical address of the viewer.

64. This data can be used to determine the exact number of views and, in many cases, the

names and addresses of viewers.

**Facts Regarding Violation of Section 604 of the FCRA**

**15 U.S.C. §1681b**

65. Section 604 of the FCRA, 15 U.S.C. 15 U.S.C. 1681(b) expressly prohibits a CRA
from furnishing consumer reports to persons that it does not have a reason to believe
have a permissible purpose to obtain the report.

    a. Defendant, however, has furnished consumer reports, in the form of their
Background Reports, to MyLife subscribers without reason to believe those
subscribers have permissible purposes to obtain such reports. Defendant
regularly provides such consumer reports without knowing subscribers'
purposes for obtaining the reports and without employing procedures for
requesting and identifying each subscriber's purpose.

    b. Defendant has, to date, admitted it furnishes its consumer reports to third
parties and has attempted to circumvent Section 604 by arguing that its
consumer reports are not consumer reports as defined by the act because the
individuals it allows to view its reports do not have a permissible purpose.

**Facts Regarding Violation of Section 605(a) of the FCRA**

**15 U.S.C. §1681c(a)**

66. Section 605(a) of the FCRA, 15 U.S.C. 15 U.S.C. 1681c(a) expressly prohibits a CRA
from furnishing consumer reports containing information about bankruptcies, civil
suits, civil judgements, tax liens, collection accounts, records of arrest and any other
adverse information (other than convictions of crimes) that antedate the report by
more than seven years.

a.  Defendant, however, routinely furnishes consumer reports, containing adverse information that antedates more than seven years.

b.  Defendant purports to base its reputation score pertaining to Plaintiff on civil matters and non-criminal traffic tickets occurring more than seven years in the past.

c.  Defendant furnished its score to various users who freely viewed the obsolete information and Plaintiff's decreased reputation score and alleged "poor" standing in the community as a direct result of Defendant's violation of the act.

**Facts Regarding Violation of Section 607(a) & (b) of the FCRA**

**15 U.S.C. §1681e(a) & (b)**

67. Section 607(a) and 607(b) of the FCRA expressly require that a CRA establish reasonable procedures to assure maximum possible accuracy of it reports and to assure that reports are only obtained by users with permissible purposes.

68. Defendants failed to maintain any procedures, including failing to enact and maintain the procedures required by FCRA Sections 607(a) and 607(b).

a.  Instead, any MyLife.com subscriber can obtain Background Reports without identify themselves or certify the purposes for which the Background Reports are sought. Users are also not required to certify that they will not use information in the Background Reports for other purposes.

b. MyLife.com also failed to make reasonable efforts to verify the identity of a new subscriber and to obtain certification by each subscriber about his or intended use for the Background Reports.

c. Similarly, the company failed to limit the furnishing of Background Reports to the purposes allowed by Section 604 and failed to assure maximum possible accuracy of the information in the Background Reports about the subjects of those Background Reports.

d. Finally, Defendant also failed to provide the User Notice to persons to whom it provides Background Reports, as required by FCRA Section 607(d).

69. As a direct result of Defendant failing to enact the aforementioned procedures, Plaintiff's report was released to various individuals unnecessarily intruding on Plaintiff's privacy and right to privacy as established by the Act.

70. Similarly, as a further result of Defendant's failure to fulfill its statutory duty, Defendant furnished reports pertaining to Plaintiff that contained false, misleading, and obsolete information, all causing Plaintiff personal financial loss and loss of standing in the community.

71. Plaintiff was further harmed by incurring legal fees in consulting with various experts regarding the course of action for correcting the errors.

72. Finally, Plaintiff suffered from loss of personal and professional time as a direct result of MyLife.com's refusal to remove the false and defamatory information and the company's refusal to comply with its statutory duties.

**Facts Regarding the Merits of Certifying a Class Action**

73. Plaintiff seeks to certify two classes of harmed individuals.

74. Plaintiff seeks class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(1)(B), (2) and (3) related to Claims One and Two for which monetary, injunctive, and declaratory relief is sought.

75. This Class is defined as: "All individuals whose consumer reports maintained by Defendant have been disclosed to persons without a permissible purpose as defined by 15 U.S.C § 1681b."

76. This Class is referred to as the "Privacy Class."

77. Plaintiff Mr. Brion Finlay also seeks class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(1)(B), (2) and (3) related to Claims One, Two, and Three for which monetary and injunctive and declaratory relief is sought.

78. This Class is defined as: "All individuals whom Defendant reports as having 'Criminal or Arrest Records' who in actuality do not have any such records."

79. This Class is referred to as the "the Defamed Class".

80. A class action is the only practicable means by which Plaintiffs and unknown members of the Privacy Class and the Defamed class can challenge Defendant's illegal disclosure of their consumer information.

81. As set forth below, this action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

82. **Numerosity:** The exact sizes of the classes are unknown to Plaintiff, but each Class plainly meets the numerosity requirement, thereby making joinder impracticable. Based on the information provided on Defendant's website, Defendant claims it has more than 300 million public pages with information on "almost everyone in America". With regard to the defamed class, in Minnesota alone Defendant has systematically reported hundreds of thousands of people with minor non-criminal driving infractions as incorrectly having a "criminal record".

83. The Defamed Class consists of millions of people who cannot or will not be able to afford to retain counsel and litigate their cases though to judgment. The Privacy Class is forward-looking with the potential for new members to join the Class on an ongoing basis as young adults, new immigrants, and others establish public records.

84. Finally, members of the proposed Classes are spread out across the state and country, and include millions of low-income individuals who lack financial resources to bring an independent action or to be joined in this action. Putative members of both classes include countless young adults, persons presently engaged in job transitions, and persons searching for work after recent COVID-19 layoffs. These individuals are facing or have experienced Defendant's defamatory and otherwise inaccurate postings frustrating their efforts to obtain new work; thus, it is reasonable to assume they would also be unable to afford counsel to bring their own separate action against Defendant.

85. **Commonality:** All persons comprising the proposed Classes are equally suited in that all individuals are presently subject to unauthorized release of their personal information otherwise protected under federal law.

86. With regard to the Defamed Class, Defendant incorrectly posts that all individuals with similar minor driving violations, petty misdemeanors, or other non-criminal citations have "criminal or arrest" records, a statement that is untrue.

87. Accordingly, Plaintiff raises claims based on questions of law and fact that are common to, and typical of, the putative class members of both Classes he seeks to represent. Common questions of fact include:

    a.  Whether Defendant assures that individuals accessing their reports have a permissible purpose.

    b.  Whether Defendant states that individuals without criminal records have such records.

    c.  Whether individuals have suffered harm.

88. Common questions of law include:

    a.  Whether individuals with minor non-criminal driving offences can be said to have "criminal or arrest records";

    b.  Whether the Communications Decency Act immunizes Defendant;

    c.  Whether the Defendant is a Consumer Reporting Agency;

89. The relief sought for each proposed Class is common to all members of that respective Class. Plaintiffs seek relief declaring Defendant a consumer reporting agency as defined by 15 U.S.C. 168a(f) and declaring that Defendant's assembled

pages are consumer reports as defined by 1681a(d). They additionally seek: (a) an order requiring Defendant to assure users of its reports have a permissible purpose, (b) monetary relief for past unauthorized disclosures; (c) monetary relief for Defendant's failure to assure maximum possible accuracy of their reports; and/or (d) in the alternative, monetary relief for Defamation.

90. **Typicality:** The claims of Plaintiff are typical of the claims of the Privacy Class as Plaintiff and all members have suffered and will continue to suffer harm from the unauthorized disclosure of their personal information.

91. The claims of Plaintiff are typical of the claims of the Defamed Class as Plaintiff and all members have suffered and will continue to suffer the same direct, irreparable injury, including loss of reputation and general standing in the community.

92. Because Plaintiff and the proposed Future Revocation Class challenge the same conduct of Defendant, the Defendant will likely assert similar defenses against Plaintiff and the proposed Class members. Moreover, the answer to whether the Defendant is a consumer reporting agency and issues consumer reports as defined by the FCRA and whether various statutory immunities are applicable to Defendant (including the CDA) will determine the success of the claims of the named Plaintiff and every other proposed Class member. If Plaintiff succeeds in the claim that Defendant has violated the FCRA and that the CDA does not apply with respect to defamation, that ruling will likewise benefit every other member of the proposed Class.

93. **Adequacy:** Plaintiff will fairly and adequately represent the interests of the proposed Classes he seeks to represent.

94. Plaintiff has no interests separate from, or in conflict with, those of the proposed Classes he seeks to represent and seeks no relief other than the monetary, declaratory, and injunctive relief sought on behalf of the entire proposed Classes.

95. **Rule 23(b)(2):** Class action status under Rule 23(b)(2) is appropriate because the Defendant has acted or failed and/or refused to act on grounds that generally apply to the proposed Classes, such that preliminary and final monetary, injunctive, and declaratory relief is appropriate and necessary with respect to each member of both Classes.  Specifically, pursuant to the Fair Credit Reporting Act, the Defendant has automatically and systematically produced defamatory reports in violation of the FCRA—without adopting procedures to assure maximum possible accuracy (or, in actuality, has adopted procedures to willfully misstate information about individuals) and has freely distributed consumer reports without assuring a permissible purpose as required by the statute. These acts and omissions are generally applicable to both of the proposed Classes. Similarly, Defendant has added to third party content in an effort to make the information have as negative an effect as possible on consumer reputations and, in so doing, has systematically defamed individuals—behavior that is generally applicable to the Defamed Class.

96. Accordingly, (a) a declaration that Defendant is a CRA and must act as such; (b) an injunction prohibiting Defendant from assembling reports without assuring maximum accuracy; (c) an injunction that prohibits Defendant from distributing

reports without assuring individuals and companies obtaining them certify a

permissible purpose; and (d) monetary relief for all individuals harmed by

Defendant's illegal content to date, would benefit every member of each of the

proposed Classes.

97. **Rule 23(g):** Plaintiff respectfully requests that the undersigned be appointed as

Class Counsel. Counsel is well suited to represent the class as counsel has

extensive experience representing individuals in matters involving complex

consumer rights matters in federal court and has ample knowledge of the relevant

statutory law. Counsel has previously litigated matters against Defendant in

Federal Court and before the American Arbitration Association. Given such

experience, Counsel is well educated in Defendant's practice of violating the

FCRA and the defenses previously asserted by the company. Counsel is similarly

financially capable of hiring additional subject matter experts and subordinate

counsel with extensive experience in class-action litigation. Counsel has the

resources, expertise, and experience to prosecute this action.

**FIRST COUNT**

**Willful Noncompliance with the FCRA**

(*On behalf of Plaintiff and All Classes*)

98. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as

though fully stated herein.

99. Defendant willfully failed to comply with the requirements of FCRA, including but

not limited to:

22

a.    failing to comply with the requirements of Section 604, 15 USC § 1681b, in assuring that users of its reports have a permissible purpose for accessing the information;

b.    failing to comply with the requirements of Section 605(a), 15 USC § 1681c(a) by limiting obsolete consumer information contained in its reports;

c.    failing to institute and follow reasonable procedures to limit the furnishing of consumer reports to the purposes listed under section 1681b of the FCRA, as required by Section 607(a), 15 USC § 1681e(a);

d.    failing to institute and follow reasonable procedures to assure maximum possible accuracy of the information in reports concerning Plaintiff, as required by Section 607(b), 15 USC § 1681e(b);

100.    As a result of Defendant's failure to comply with the requirements of FCRA, Plaintiff has suffered, and continues to suffer, actual damages, including economic loss, lost opportunity to receive credit, damage to reputation, invasion of privacy, interference with his normal and usual activities, emotional distress, anger, frustration, humiliation, anxiety, fear, worry, and related health problems, for which Plaintiff seeks damages in an amount to be determined by the jury. Plaintiff also seeks punitive damages in an amount to be determined by the jury.

101.    Plaintiff requests attorney's fees pursuant to 15 USC § 1681n(a).

**SECOND COUNT**

**Negligent Noncompliance with the FCRA**

23

(*Plead in the Alternative on behalf of Plaintiff and All Classes*)

102.  Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

103.  Defendant negligently failed to comply with the requirements of the FCRA, including but not limited to:

    a.    failing to comply with the requirements of Section 604, 15 USC § 1681b, in assuring that users of its reports have a permissible purpose for accessing the information;

    b.    failing to comply with the requirements of Section 605(a), 15 USC § 1681c(a) by limiting obsolete consumer information contained in its reports;

    c.    failing to institute and follow reasonable procedures to limit the furnishing of consumer reports to the purposes listed under section 1681b of the FCRA, as required by Section 607(a), 15 USC § 1681e(a);

    d.    failing to institute and follow reasonable procedures to assure maximum possible accuracy of the information in reports concerning Plaintiff, as required by Section 607(b), 15 USC § 1681e(b);

104.  As a result of Defendant's failure to comply with the requirements of FCRA, Plaintiff and all potential class members have suffered, and continue to suffer, actual damages, including economic loss, lost opportunity to receive credit, damage to reputation, invasion of privacy, interference with normal and usual activities, emotional distress, anger, frustration, humiliation, anxiety, fear, worry,

and related health problems, for which Plaintiff and the class members seek damages in an amount to be determined by a jury.

105. Plaintiff requests attorney's fees pursuant to 15 USC § 1681o(a).

## THIRD COUNT

### Common Law Defamation

(*Plead in the Alternative on behalf of Plaintiff and the Defamed Class*)

106. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

107. Defendant publicly posted false information about Plaintiff; to wit: "Brion DOES have arrest or criminal records."

108. Defendant, in an effort to raise the stakes, further stated, "Brion's report may contain graphic content and sensitive details." (Emphasis original.)

109. Defendant's statement that Mr. Finlay's report contained graphic content was known to be false at the time Defendant made the statement.

110. Said statements regarding Plaintiff's arrest or criminal records were false in that Plaintiff has no criminal or arrest record.

111. Defendant made these statements on the internet generally, and specifically to all individuals described in Defendant's records by IP addresses.

112. Defendant's statements were made with malice in that they were purposefully intended to harm Plaintiff and thereby incentivize him to pay money to remove the harmful content.

113.   Defendant's statements did, indeed, harm Plaintiff's reputation and/ or standing in the community.

114.   Defendant's actions constitute defamation per se.

### Prayer for Relief

WHEREFORE, Plaintiff, by and through his attorney, respectfully prays for a reasoned Award in favor of Plaintiff and against Defendant as follows:

a.   all actual compensatory damages suffered;

b.   statutory damages in an amount up to $1,000.00 per violation per plaintiff, pursuant to 15 U.S.C. §1681n;

c.   punitive damages;

d.   injunctive relief prohibiting such conduct in the future;

e.   reasonable attorney's fees, litigation expenses, and cost of suit; and

f.   any other relief deemed appropriate by this Honorable Court.

Dated: August 5, 2020          Madgett & Klein, PLLC

s/ David J.S. Madgett
David J.S. Madgett (#0390494)
1161 E Wayzata Blvd, Suite 314
Wayzata, MN 55391
(612) 470-6529
dmadgett@madgettlaw.com

ATTORNEYS FOR PLAINTIFF