## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Brion Finlay, and all others similarly situated,<br><br>   Plaintiff,<br><br>v.<br><br>MyLife.com Inc.,<br><br>   Defendant. | Case No. 20-cv-1105 (SRN/DTS)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

David J.S. Madgett, Madgett & Klein, PLLC, 1161 E Wayzata Blvd, Suite 314, Wayzata, MN 55391, for Plaintiff.

Robert R. Hopper and Jason Scott Juran, Robert R. Hopper & Associates, 333 South Seventh Street, Suite 2450, Minneapolis, MN 55402, for Plaintiff.

Eric M. Roberts and Raj N. Shah, DLA Piper LLP (US), 444 West Lake Street, Suite 900, Chicago, IL 60606, for Defendant.

Richard R. Voelbel and Brandon J. Wheeler, Felhaber, Larson, Fenlon & Vogt, PA, 220 South 6th Street, Suite 2200, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter comes before the Court on Defendant MyLife.com Inc.'s ("MyLife") Motion to Dismiss the Complaint ("Motion to Dismiss") [Doc. No. 19] under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **DENIES** the motion.

## I.    BACKGROUND

### A.    Finlay's MyLife Profile

1

Plaintiff Brion Finlay is a resident of Minnesota and is currently searching for a new job. (*Id.* ¶¶ 1, 40.) He alleges that it is common for prospective employers to search a prospective employee's name through Google's search engine. (*Id.* ¶¶ 1-2.) When one searches the name "Brion Finlay," Google generates a search result for "www.mylife.com," stating the following: "Brion Finlay (C), 42 - Minneapolis, MN Has Court or Arrest Records …." (*Id.* ¶¶ 2-3.) Upon clicking this link, the user arrives at a webpage stating that "**Brion DOES have Arrest or Criminal Records**" in bolded red text. (*Id.* ¶¶ 4-5 (emphasis in original).) This webpage then states: "**Check Full Background Report** to see possible **arrest or conviction records** we have found on Brion. This may include any **DUIs, traffic tickets and outstanding warrants**. When applicable, we may show **where the crime occurred** and provide **details about the offense**." (*Id.* ¶ 5 (emphasis in original).) This webpage also provides a link to "View Brion's Court, Arrest or Criminal Records." (*Id.*) When a user attempts to view Finlay's "Court, Arrest or Criminal Records" on his MyLife profile, MyLife states that Finlay's profile may contain "graphic content and sensitive details" and suggests that Finlay is a sex offender—which he is not. (*Id.* ¶ 8.)

MyLife also provides a "Reputation Score" on Finlay's profile. To calculate his "Reputation Score," MyLife allegedly collects and analyzes a variety of information, including certain public records and "user reviews" (*i.e.*, "personal reviews written by others"). (*Id.* ¶¶ 6, 44.) According to Finlay, MyLife claims on its website that the "Reputation Score" it calculates is "more important than a credit score" and that its "Reputation Scores" may assist in selecting among, *inter alia*, job applicants, service

2

providers, business opportunities, and dating prospects. (*Id.* ¶ 11.) Indeed, Finlay alleges that MyLife's markets its "Reputation Score" to employers. (*Id.* ¶ 49.) In addition, MyLife's advertisements acknowledge that employers may use its "Reputation Scores" and that failing to have a good "Reputation Score" may cause consumers to lose out on employment opportunities. (*Id.* ¶ 50.) For example, in one advertisement, MyLife stated: (1) "Did you ever send out your resume and never hear back?"; and (2) "A bad reputation can hurt you personally and professionally." (*Id.* ¶ 12.) According to Finlay, MyLife assigned a "Reputation Score" of 2.32 to 3.51 to him, and MyLife has stated elsewhere that a "Reputation Score" of 2.32 constitutes a poor "Reputation Score." (*Id.* ¶¶ 6-7.)

## B.    How MyLife Creates, Markets, and Sells Its Profiles

According to Finlay, MyLife searches public records databases, among other sources, collects "user reviews," and generates his MyLife profile using all of the information it aggregates. (*Id.* ¶¶ 20, 44.) Further, rather than simply including the aggregated information in the form that third-parties supply it, MyLife instead "interprets" and "editorializes" the aggregated information and often does so incorrectly. (*Id.* ¶¶ 22-24.) For example, according to Finlay, MyLife incorrectly interprets petty misdemeanors in Minnesota as "criminal records" and falsely states that people, such as Finlay, who have received petty misdemeanors in the form of traffic tickets, have "criminal or arrest records." (*Id.* ¶ 24; *see also* Minn. Stat. § 609.02, subd. 4a ("'Petty misdemeanor' means a petty offense which is prohibited by statute, which does not constitute a crime ….").) In addition, Finlay alleges that MyLife evaluates the information it aggregates to calculate its "Reputation Scores," as described above.

In Finlay's view, MyLife includes all of this information in its profiles to cause reputational harm and incentivize consumers to pay MyLife to remove such information from their profiles. (*Id.* ¶ 26.) Indeed, Finlay alleges that MyLife offers the subjects of its profiles the option to remove information on their MyLife profile for a fee. (*Id.* ¶ 13.) MyLife requests these payments by asking individuals to "claim" their profile and "repair" their reputations. (*Id.* ¶ 14.)

In addition to targeting the individual subjects of its profiles, Finlay alleges that MyLife markets and sells information on its profiles to third-parties. (*Id.* ¶¶ 9-10, 13.) According to Finlay, MyLife markets its profiles to third-parties for employment and other purposes. (*Id.* ¶¶ 44, 47.) He alleges that MyLife expects and understands that its profiles may be used for employment purposes, and third-parties purchase and use MyLife's profiles for this purpose. (*Id.*) In fact, Finlay alleges that individuals seeking to employ him, among others, have consulted his MyLife profile. (*Id.* ¶¶ 54-56.) Further, Finlay alleges that MyLife takes no steps to assure the accuracy of the information in its profiles. (*Id.* ¶¶ 51-52, 60.)[1]

## II.    PROCEDURAL HISTORY

On May 7, 2020, Finlay filed his initial complaint in this action. (*See* Compl. [Doc. No. 1].) On August 7, 2020, Finlay filed an amended complaint, which is the operative

---

[1] The Court notes that the government has made similar allegations against MyLife in a pending lawsuit in the Central District of California. *See United States v. MyLife.com, Inc.*, No. 2:20-cv-6692-JFW (PDx), 2020 U.S. Dist. LEXIS 209103, at *2 (C.D. Cal. Nov. 6, 2020) (noting government's allegations that MyLife does not try to determine whether its information is accurate).

complaint, alleging three Counts. (*See* Am. Compl. [Doc. No. 17].) Under Count 1, Finlay alleges that MyLife willfully failed to comply with the Fair Credit Reporting Act ("FCRA") by: (1) failing to assure that users of its reports have a permissible purpose for accessing them, in violation of 15 U.S.C. § 1681b; (2) failing to limit obsolete consumer information contained in its reports, in violation of § 1681c(a); (3) failing to institute and follow reasonable procedures to limit the furnishing of consumer reports to the permissible purposes under § 1681b, in violation of § 1681e(a); and (4) failing to institute and follow reasonable procedures to assure maximum possible accuracy of the information in reports concerning Finlay, in violation of § 1681e(b). (*Id.* ¶¶ 98-101.) Under Count 2, Finlay alleges that MyLife negligently failed to comply with the FCRA on the same four grounds upon which it alleges willful noncompliance. (*Id.* ¶¶ 102-05.) Under Count 3, Finlay alleges that MyLife engaged in common law defamation by stating "Brion DOES have arrest or criminal records" and "Brion's report may contain graphic content and sensitive details." (*Id.* ¶¶ 106-14.)

## III.   DISCUSSION

MyLife moves the Court to dismiss the Complaint on three general grounds: (1) Finlay fails to adequately allege standing under Rule 12(b)(1); (2) Finlay fails to state a claim under the FCRA under Rule 12(b)(6); and (3) Finlay fails to state a claim for common law defamation under Rule 12(b)(6).

### A.  Standard of Review

Where the defendant argues that the facts alleged in the complaint fail to establish subject matter jurisdiction under Rule 12(b)(1)—as MyLife does here—the plaintiff is

afforded similar safeguards as in a Rule 12(b)(6) motion. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Namely, the Court must "accept as true all factual allegations in the complaint, giving no effect to conclusory allegations of law," and determine whether the plaintiff's alleged facts "affirmatively and plausibly suggest" that jurisdiction exists. *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007). The Court's review is limited to the face of the pleadings. *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015).

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the facts alleged in the complaint as true, and views those allegations in the light most favorable to the plaintiff. *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). However, the Court need not accept as true wholly conclusory allegations or legal conclusions couched as factual allegations. *Id.* To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.

### B.    Standing

Article III of the Constitution limits federal jurisdiction to "cases or controversies." *Auer v. Trans Union, Ltd. Liab. Co.*, 902 F.3d 873, 877 (8th Cir. 2018) (quoting *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2011)). If a plaintiff lacks Article III standing, the district court lacks subject matter jurisdiction. *Id.* To establish standing under Article III, a plaintiff must have: (1) "suffered an injury in fact," (2) "that

is fairly traceable to the challenged conduct of the defendant," and (3) "that is likely to be redressed by a favorable judicial decision." *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

To satisfy the injury-in-fact requirement, a plaintiff must show an injury that is "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To be "particularized," the injury must affect the plaintiff in a "personal and individual way." *Id.* (citation omitted). To be "concrete," the injury must be "*de facto*," meaning "it must actually exist." *Id.* (citation omitted). "Article III standing requires a concrete injury even in the context of a statutory violation," and a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at 1549 (citation omitted).[2] To determine whether an intangible harm constitutes a concrete injury-in-fact, the Court must consider Congress' judgment and whether the alleged intangible harm has a close relationship to a harm that traditionally provided a basis for suit in the Anglo-American legal system. *Id.*

---

[2] In *Spokeo*, the Supreme Court clarified that there are certain circumstances in which the mere violation of a procedural right can be sufficient to qualify as an injury-in-fact. *Id.* Put differently, there are some cases where a plaintiff "need not allege any additional harm beyond the one Congress has identified." *Id.* (citing *Federal Election Comm'n v. Akins*, 524 U.S. 11, 20-25 (1998) (group of voters' "inability to obtain information" that Congress made public is an injury-in-fact under Article III); *Public Citizen v. Department of Justice*, 491 U.S. 440, 449 (1989) (two advocacy organizations' failure to obtain certain information subject to disclosure under federal law "constitutes a sufficiently distinct injury to provide standing to sue").

The standing requirements "do not change in the class action context." *In re SuperValu, Inc., Customer Data Sec. Breach Litig.*, 870 F.3d 763, 768 (8th Cir. 2017) (citing *Spokeo*, 136 S. Ct. at 1547 n.6). At the pleading stage, only "'general allegations' of injury, causation, and redressability" are required. *Id.* at 773 (quoting *Lujan*, 504 U.S. at 561).

The heart of the parties' dispute on standing is whether Finlay plausibly alleges an injury-in-fact. In MyLife's view, Finlay fails to allege a plausible injury-in-fact because his allegations that his MyLife profile was disclosed to a third-party are speculative and do not support a plausible inference that any third-party actually accessed the profile. (Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem.") [Doc. No. 21] at 13; Def.'s Reply in Supp. of Mot. to Dismiss ("Def.'s Reply") [Doc. No. 27] at 4-5; *see* Am. Compl. ¶¶ 54-56.) Further, MyLife argues that merely making Finlay's profile available on the Internet does not constitute an injury-in-fact because, without any third-party accessing it, there can be no concrete injury-in-fact. (Def.'s Reply at 5-6.)

In response, Finlay contends that he has plausibly alleged an injury-in-fact for several reasons. (Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n") [Doc. No. 26] at 2-6.) First, he argues that MyLife's publication of his profile on the Internet—even without evidence that it was accessed by a third-party—constitutes an injury-in-fact because the FCRA forbids the publication of consumer reports on the Internet. (*Id.* at 2-3.) Next, Finlay contends that he has plausibly alleged disclosure of his MyLife profile to third-parties. (*Id.* at 3.) He emphasizes that, as alleged in the Complaint, he is currently searching for jobs, and it is common for prospective employers to perform an Internet

search of a prospective employee. Moreover, he specifically alleges that "[v]arious individuals seeking to employ [him]" and "[o]ther individuals with no permissible purpose" did access his profile. (*See* Am. Compl. ¶¶ 54-56.)

Viewing Finlay's allegations in the light most favorable to him, the Court finds that he plausibly alleges an actual injury-in-fact that is "particularized" and "concrete." First, Finlay satisfies the particularization prong of the injury-in-fact analysis. Namely, he alleges that MyLife's conduct affected him in a "personal and individual way" by creating and making available on the Internet a MyLife profile for him specifically. *See Spokeo*, 136 S. Ct. at 1548.

Second, Finlay plausibly alleges an injury-in-fact that is concrete. Indeed, Finlay alleges that individuals seeking to employ him, among others, have consulted his MyLife profile. (*See* Am. Compl. ¶¶ 54-56.) Further, the allegations in the Complaint—particularly Finlay's status as a job-seeker and the widespread availability on the Internet of the allegedly false consumer information about him—give rise to a reasonable inference that a third-party viewed that information on his MyLife profile. Notably, other courts have made similar inferences and reached similar conclusions at the pleading stage where the information at issue was widely available online through a defendant's website. *See, e.g.*, *Stasi v. Inmediata Health Grp. Corp.*, No. 19cv2353 JM (LL), 2020 U.S. Dist. LEXIS 217097, at *12 (S.D. Cal. Nov. 19, 2020) (holding that it was "reasonable to infer" that plaintiffs' personal information was viewed by a third-party after it became available on the Internet in light of plaintiffs' allegations that the information was "posted on the Internet," "searchable and findable by anyone with access to an internet search engine such

as Google," and "viewed by unauthorized persons"); *Rowe v. Unicare Life & Health Ins. Co.*, No. 09 C 2286, 2010 U.S. Dist. LEXIS 1576, at *1 (N.D. Ill. Jan. 5, 2010) ("Given the widespread exposure of the information in this case, the Court may properly make the inference that the information was accessed at some point for the purposes of this motion [to dismiss] only."); *see also, e.g.*, *Cole v. Gene by Gene, Ltd.*, No. 1:14-cv-00004-SLG, 2017 U.S. Dist. LEXIS 101761, at *2-3, 9 (D. Alaska June 30, 2017) (finding that the public dissemination of personal information on defendant's websites, without plaintiff's consent, was a sufficiently concrete injury-in-fact); *Rodriguez v. Universal Prop. & Cas. Ins. Co.*, No. 16-60442-CIV-COHN/SELTZER, 2016 U.S. Dist. LEXIS 194758, at *6, 8-9 (S.D. Fla. Aug. 19, 2016) (finding that plaintiffs plausibly alleged a "risk of real harm," rendering the alleged FCRA violations sufficiently concrete injuries, where plaintiffs alleged that their personal information was available on a publicly accessible portion of defendant's website).

In addition, considerations such as Congress' judgment and the close relationship that the alleged harms have to harms redressable at common law support a finding that Finlay has plausibly alleged a concrete injury-in-fact at this stage of the proceedings. *See Spokeo*, 136 S. Ct. at 1549. As to Congress' judgment, the FCRA is intended to "protect consumer privacy," *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007), and "to curb the dissemination of false information," *Spokeo*, 136 S. Ct. at 1550. *Accord* 15 U.S.C. § 1681 (detailing congressional findings and statement of purpose as to the FCRA). Here, protecting his privacy and curbing the dissemination of false information about him are some of the very interests that Finlay seeks to vindicate through the instant action.

Moreover, the harms alleged in this action are closely related to harms that have provided a traditional basis for suit at common law. The unauthorized disclosure of consumer information, including false information, is closely related to traditional common law actions for invasion of privacy. *See* Restatement (Second) of Torts § 652A (Am. Law Inst. 1977); *see also Auer*, 902 F.3d at 877 (likening FCRA claim to common law claim for invasion of privacy). It is also closely related to common law actions for defamation. *See Alame v. Mergers Mktg.*, No. 5:17-CV-06066-BCW, 2017 U.S. Dist. LEXIS 151746, at *5 (W.D. Mo. Sep. 19, 2017) ("The FCRA protects individuals from the dissemination of inaccurate information that might negatively impact the plaintiff, in the same way that a common law claim for defamation protects an individual from 'falsely attributed characteristics incompatible with the proper exercise of an individual's lawful business, trade, profession, or office.'" (quoting *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1114 (9th Cir. 2017))). Consequently, for all of the above reasons, the Court concludes that Finlay has alleged an injury-in-fact sufficient to confer standing at this stage.

Next, the Court considers whether Finlay's alleged harms are fairly traceable to the challenged conduct of MyLife. According to MyLife, all of the information contained within Finlay's MyLife profile is publicly available elsewhere and none of the information on his profile actually originated from MyLife. (Def.'s Mem. at 13.) Therefore, in MyLife's view, removing the information from Finlay's profile would "do nothing" because all of the information that allegedly caused Finlay's injuries would still exist in the public domain.

The Court disagrees. As the Complaint alleges, MyLife itself devised and calculates the "Reputation Score" that it includes on consumers' profiles. That, alone, dismantles MyLife's argument that all of the information in its profiles is available elsewhere in the public domain. Further, as just another example, the Complaint alleges that Finlay's MyLife profile falsely states that he has "arrest or criminal records." But the Complaint contains no allegation that MyLife found this statement elsewhere nor that it does exist elsewhere in the public domain. Consequently, the harms alleged in the Complaint are fairly traceable to MyLife's conduct.

Finally, the Court considers whether the alleged harms Finlay suffered are likely to be redressed by a favorable judicial decision. The Court finds that they are because an award of damages and/or injunctive relief would redress the alleged harms.

Accordingly, at this stage, Finlay has sufficiently alleged Article III standing.

### C.    The FCRA

MyLife contends that the Complaint fails to state a claim under the FCRA because the Complaint: (1) does not plausibly allege that MyLife provides "consumer reports"; (2) does not plausibly allege that MyLife is a "consumer reporting agency" ("CRA"); and (3) does not plausibly allege willful violations of the FCRA. The Court considers each ground in turn.

### 1. Whether Finlay Plausibly Alleges that MyLife Provides Consumer Reports

The FCRA defines a "consumer report" as:

any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness

[creditworthiness], credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—

> (A) credit or insurance to be used primarily for personal, family, or household purposes;

> (B) employment purposes; or

> (C) any other purpose authorized under section 604 [15 U.S.C. § 1681b].

15 U.S.C. § 1681a(d)(1). The term "employment purposes" under § 1681a(d)(1)(B) means a report "used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee." *Id.* § 1681a(h).

MyLife contends that its profiles are not consumer reports because there are no well-pleaded allegations that its profiles are used for employment purposes, or any other covered purposes under the FCRA. (Def.'s Mem. at 16.) Further, MyLife asserts that its "site terms" expressly prohibit parties from using information within MyLife's profiles in making employment, lending, housing, or insurance decisions.[3] In response, Finlay argues that MyLife does provide consumer reports because MyLife purports to aggregate a variety of

---

[3] In making this argument, MyLife asks the Court to consider MyLife's "User Agreement." (*See* Roberts Decl. [Doc. No. 22] Ex. 5.) Courts generally do not consider matters outside the pleadings on a motion to dismiss. *Dunnigan v. Fed. Home Loan Mortg. Corp.*, 184 F. Supp. 3d 726, 734 (D. Minn. 2016). But they may "consider exhibits attached to the complaint, documents that are necessarily embraced by the pleadings, and public records." *Id.* According to MyLife, the Complaint embraces this "User Agreement" because the Complaint mentions MyLife's "site terms." (*See* Def.'s Mem. at 4 n.1; Am. Compl. ¶ 51.) However, it is not at all clear to the Court that the "site terms" noted in the Complaint refer to the "User Agreement" that MyLife filed. Accordingly, the Court declines to consider the "User Agreement" at this stage.

personal information, collect "user reviews," and analyze all of this data to calculate a "Reputation Score" for consumers, such as himself. (Pl.'s Opp'n at 7-8.) Further, according to Finlay, MyLife markets its profiles—highlighting its "Reputation Scores"—to employers, among others, as matters that should factor into employment decisions.

The Court finds that Finlay adequately alleges that MyLife provides "consumer reports" under the FCRA. First, Finlay alleges that his MyLife profile contains information bearing on matters covered by § 1681a(d)(1). (*See* Am. Compl. ¶ 47.) For example, MyLife's inclusion of a "Reputation Score" in Finlay's profile plausibly bears on, at least, his "general reputation." In addition, Finlay alleges that the information in his MyLife profile "is used," "expected to be used," or "collected in whole or in part" for the purpose of serving as a factor in evaluating Finlay's eligibility for employment. For example, he alleges that MyLife markets its profiles to employers, expects its profiles to be used for employment purposes, and that its profiles are in fact used for employment purposes. (*See* Am. Compl. ¶¶ 47-50.) Finally, the "site terms" that Finlay and MyLife reference are not properly before the Court at this time, so the Court declines to dismiss Finlay's Complaint based on what these terms may or may not provide, especially in light of Finlay's well-pleaded allegations described above. Thus, Finlay plausibly alleges that MyLife provides consumer reports.[4]

### 2.  Whether Finlay Plausibly Alleges that MyLife Is a CRA

---

[4] Another court reached the same conclusion, finding that the government plausibly alleged that MyLife provides consumer reports under the FCRA. *See United States v. MyLife.com, Inc.*, No. 2:20-cv-6692-JFW (PDx), 2020 U.S. Dist. LEXIS 209103, at *12-16 (C.D. Cal. Nov. 6, 2020).

The FCRA defines a "consumer reporting agency" as:

> any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f). Under this definition, "an entity is a CRA if it satisfies four requirements: (1) it acts in exchange for compensation of the kind described; (2) it regularly assembles or evaluates information on consumers; (3) its purpose in doing so is to furnish consumer reports; and (4) it utilizes interstate commerce in the preparation or furnishing of a consumer report." *Dunnigan*, 184 F. Supp. 3d at 733 (citations and internal quotation marks omitted).

MyLife contends that the Complaint fails to plausibly allege it is a CRA for two reasons. First, it argues that the Complaint does not allege that it acted for compensation. (Def.'s Mem. at 18-19.) Second, it argues that the Complaint fails to allege that MyLife intended to furnish a consumer report. (*Id.* at 19-21.)

The Court first considers MyLife's argument that there are no allegations that it acted for compensation. According to MyLife, its profiles that are accessible through Google are available for free. (Def.'s Mem. at 18-19.) Further, MyLife argues that the allegations that it seeks payment from individuals who "claim" their profiles—rather than from third-parties seeking that information—undermines the conclusion that MyLife is a CRA.

The Court disagrees. MyLife is certainly correct that Finlay alleges that MyLife seeks payments from individuals seeking to remove allegedly false information from their MyLife profiles. (*See, e.g.*, Am. Compl. ¶¶ 13-15, 26, 46.) But his allegations—which the Court must take as true at this stage—do not stop there. Indeed, he plainly alleges that MyLife sells consumer information to third-parties "[f]or a fee." (*See id.* ¶¶ 9-10, 46.) Moreover, even if some of the information on Finlay's MyLife profile is available for free through an Internet search engine, the Complaint still alleges that MyLife charges fees for access to certain information regarding the consumer who is the subject of the profile. (*See id.* ¶¶ 9-10.) Consequently, the Complaint plausibly alleges that MyLife acts for compensation.

Next, the Court considers MyLife's argument that Finlay fails to allege that it intended to furnish consumer reports to third-parties. According to MyLife, § 1681a(f) requires Finlay to prove that MyLife had a specific intent that the information it furnished constituted a consumer report. (*See* Def.'s Mem. at 19-20.) It points the Court to two appellate decisions to support this reading of the statute. *See Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 104 (2d Cir. 2019) ("A 'consumer reporting agency' is an entity that intends the information it furnishes to constitute a 'consumer report.'"); *Zabriskie v. Fed. Nat'l Mortg. Ass'n*, 940 F.3d 1022, 1027 (9th Cir. 2019) (the "FCRA applies to an entity that assembles or evaluates consumer information with the intent to provide a consumer report to third parties"). In response, Finlay contends that MyLife conflates an intention "to furnish consumer reports" with an intention "to furnish information which constitutes a consumer report." (Pl.'s Opp'n at 8.) In Finlay's view, whether MyLife intended that its

16

profiles constituted consumer reports is irrelevant; instead, what matters is that MyLife intended that third-parties would review and purchase its profiles, which, in its view, qualify as consumer reports.

Although the parties debate the meaning of "for the purpose of" under § 1681a(f), the Court need not address that dispute at this stage because MyLife's argument and reliance on *Kidd* and *Zabriske* are premature. Both *Kidd* and *Zabriske* were decided at summary judgment, after the parties engaged in fact discovery regarding the intentions of the defendants in furnishing the information at issue in those cases. Here, by contrast, this Court can only consider the allegations in the Complaint and must accept them as true. Consequently, the Court accepts as true Finlay's well-pleaded allegations that MyLife intended to furnish consumer reports to third-parties. (*See* Am. Compl. ¶¶ 44-45.)

Accordingly, Finlay has plausibly alleged that MyLife is a CRA. *Accord MyLife.com, Inc.*, 2020 U.S. Dist. LEXIS 209103, at *10-12 (finding that the government plausibly alleged that MyLife is a CRA).[5]

### 3. Whether Finlay Plausibly Alleges Willful Noncompliance with the FCRA

MyLife asks the Court to dismiss Finlay's request for statutory and punitive damages because it believes he fails to plausibly allege willful noncompliance with the

---

[5] MyLife also urges the Court to dismiss the Complaint because, in its view, Finlay does not plausibly allege that: (1) a third-party viewed Finlay's MyLife profile; and (2) his profile contained false information. (*See* Def.'s Mem. at 21-22.)

The Court declines to dismiss the Complaint on these grounds. As discussed above, Finlay's allegations give rise to a reasonable inference that a third-party viewed his profile, and as discussed below, he plausibly alleges that his profile contains false information.

FCRA. When a person willfully violates the FCRA, a consumer may receive actual damages, or statutory damages ranging from $100 to $1,000, as well as punitive damages, costs, and attorney's fees. 15 U.S.C. § 1681n(a). Willful violations of the FCRA include reckless violations. *Poehl v. Countrywide Home Loans, Inc.*, 528 F.3d 1093, 1096 (8th Cir. 2008) (citations omitted). However, "a company subject to [the] FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco Ins. Co.*, 551 U.S. at 69.

Here, MyLife asks the Court to dismiss Finlay's request for statutory and punitive damages because, in its view, MyLife is not subject to the FCRA, and even if it were, Finlay fails to allege that MyLife recklessly disregarded any duties under the FCRA. (*See* Def.'s Mem. at 23-24.) Taking the alleged facts as true, however, Finlay plausibly alleges that MyLife is subject to the FCRA for the reasons discussed above. Further, based on all of the facts alleged in the Complaint, the Court finds that Finlay has alleged sufficient facts to support a willfulness claim. Accordingly, the Court denies MyLife's request to dismiss Finlay's claim for statutory and punitive damages at this stage.

### D.   Defamation

Finally, the Court considers whether Finlay has stated a claim for defamation. To state a claim for defamation under Minnesota law, a party must plausibly allege four elements: (1) that the statement or communication in question is defamatory; (2) that the statement is false; (3) that the statement refers to the plaintiff; and (4) that the statement

was published to a third-party. *Tholen v. Assist Am., Inc.*, 970 F.3d 979, 983 (8th Cir. 2020)

(citing *MSK EyEs Ltd. v. Wells Fargo Bank, Nat'l Ass'n*, 546 F.3d 533, 542 (8th Cir. 2008);

*Weinberger v. Maplewood Review*, 668 N.W.2d 667, 673 (Minn. 2003)). Minnesota law

"requires that a claim for defamation must be pled with a certain degree of specificity."

*Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1011 (8th Cir. 2005), *abrogated by Torgerson v.

City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). "At a minimum, the plaintiff must allege

who made the allegedly libelous statements, to whom they were made, and where." *Id.*

(citations and internal quotation marks omitted). In addition, "Minnesota law generally

requires that in defamation suits, the precise words complained of be set forth 'verbatim.'"

*Magee v. Trustees of the Hamline Univ., Minn.*, 957 F. Supp. 2d 1047, 1074 (D. Minn.

2013) (quoting *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn.

2000)), *aff'd* 747 F.3d 532 (8th Cir. 2014).

Here, Finlay alleges that MyLife defamed him by including the following

statements on his MyLife profile: (1) "Brion DOES have arrest or criminal records"; and

(2) "Brion's report may contain graphic content and sensitive details." (*See* Am. Compl.

¶¶ 107-10.) However, in MyLife's view, the Complaint fails to state a claim for defamation

because it: (1) fails to allege that any statement was published to a third-party; (2) lacks the

specificity that Minnesota law requires; and (3) fails to allege a false statement. (Def.'s

Mem. at 24-28.)

First, the Court addresses MyLife's argument that the Complaint fails to allege a

publication to a third-party. According to MyLife, the mere availability of Finlay's MyLife

profile on the Internet does not qualify as a statement made to a third-party. (Def.'s Mem.

at 26.) MyLife further contends that the statements at issue "already existed publicly," so "it cannot be said that MyLife caused the statements to be published." In response, Finlay contends that he has alleged a third-party publication because he alleged that his prospective employers viewed the allegedly defamatory statements. (Pl.'s Opp'n at 14.)

The Court agrees with Finlay that he has sufficiently alleged a third-party publication. As discussed previously, the Complaint's allegations give rise to a reasonable inference of third-party disclosure, which is sufficient to plausibly allege a third-party publication. In addition, as to MyLife's argument that the allegedly defamatory statements "already existed publicly," the Court finds no support for that in the Complaint, and MyLife does not point the Court to any support for this argument. (*See* Def.'s Mem. at 26.) Finlay plausibly alleges publication to a third-party.

Second, the Court considers MyLife's argument that the Complaint lacks sufficiently specific allegations. According to MyLife, the Complaint lacks the specificity required to state a claim for defamation because it does not specifically name the viewers of any allegedly defamatory statement, nor the dates that any third-party viewed such statements. (Def.'s Mem. at 24-26.) In response, Finlay contends that his allegations are sufficiently specific because he identified: (1) the exact words of the defamatory statements; (2) the speaker; (3) the group to whom the defamatory statements were published; and (4) the forum in which the statements were made. (Pl.'s Opp'n at 14-15.) In his view, Minnesota law does not require a plaintiff to plead the specific names of the third-party viewers, nor does it require pleading the specific dates that third-parties viewed the statements.

Here, Finlay has alleged a claim of defamation with sufficient specificity under Minnesota law. He identifies the allegedly defamatory statements verbatim, he alleges that MyLife made these statements, and that MyLife made them on its online profile for Finlay. (*See* Am. Compl. ¶¶ 4, 8, 106-11.) He also alleges that MyLife made these allegedly defamatory statements to Finlay's prospective employers, among others. (*See id.* ¶¶ 54-56, 111; *see also Tholen*, 970 F.3d at 983 n.1 (noting that the recipients of the allegedly defamatory statement included a "20,000 person subscription base of the magazine as well as any person with access to the internet link to the online version of the publication").) At this stage, these allegations are sufficiently specific under *Pope* and the rest of the authority described above. Although MyLife argues that Finlay must plead the specific names of third-parties who viewed the allegedly defamatory statements and the dates of such views, the Court has found no such pleading requirement under Minnesota law, and MyLife has not pointed the Court to any authority indicating otherwise.

Third, and finally, the Court considers MyLife's argument that Finlay fails to allege a false statement. In the context of defamation, falsity "means that the alleged statement is not 'substantially true.'" *Range Dev. Co. v. Star Tribune*, 885 N.W.2d 500, 510 (Minn. Ct. App. 2016) (quoting *McKee v. Laurion*, 825 N.W.2d 725, 730 (Minn. 2013)). If a statement is substantially true, "minor inaccuracies of expression or detail are immaterial." *McKee*, 825 N.W.2d at 730.

MyLife contends that the statement "Brion DOES have arrest or criminal records" is true because, after that sentence, Finlay's profile states that "[t]his may include … traffic tickets." (*See* Def.'s Mem. at 26-28.) MyLife notes that Finlay has received a few traffic

tickets, so in its view, the statement that he has "arrest or criminal records" is true. (*See* Roberts Decl. [Doc. No. 22] Exs. 1-3.) Finlay responds that his traffic tickets do not in fact constitute "arrest or criminal records" because his traffic tickets are only petty misdemeanors, which are not crimes under Minnesota law. (*See* Pl.'s Opp'n at 15; Am. Compl. ¶¶ 24-25; *see also* Minn. Stat. § 609.02, subd. 4a ("'Petty misdemeanor' means a petty offense which is prohibited by statute, which does not constitute a crime ....").) Therefore, according to Finlay, MyLife's statement is false on its face.

The Court finds that Finlay plausibly alleges that MyLife's statement is false. In addition to pointing to Minn. Stat. § 609.02, subd. 4a, Finlay alleges that the traffic tickets he received are "commonly" known as "violations," not crimes. (*See* Am. Compl. ¶ 24.) This is enough to plausibly allege falsity, particularly because the truth or falsity of a statement is generally "a question for the jury." *McKee*, 825 N.W.2d at 730 (citing *Lewis v. Equitable Life Assurance Soc'y of the United States*, 389 N.W.2d 876, 889 (Minn. 1986)).

## IV.  CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that MyLife's Motion to Dismiss [Doc. No. 19] is **DENIED**.

**IT IS SO ORDERED.**


Dated: March 16, 2021                                   s/Susan Richard Nelson
                                                                            SUSAN RICHARD NELSON
                                                                            United States District Judge